IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 15, 2017

**STATE OF TENNESSEE v. DEANN ANELIA WALLS**

**Appeal from the Circuit Court for Rutherford County**
**No. F-74032  Royce Taylor, Judge**

_____

**No. M2016-01121-CCA-R3-CD**

_____

Defendant, Deann Anelia Walls, appeals the trial court's order requiring her to serve in confinement her effective ten-year sentence resulting from her guilty plea to nineteen counts of prescription medication fraud and thirty-six counts of identity theft. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Jeffrey O. Powell, Madison, Tennessee, for the appellant, Deann Anelia Walls.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Jennings H. Jones, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

Defendant was indicted on and pled guilty to nineteen counts of prescription medication fraud and thirty-six counts of identity theft, Class D felonies. *See* Tenn. Code Ann. §§ 39-14-150(b)(1)(B)(iii), (i)(1) (Supp. 2013); 53-11-402(a)(3), (b)(1) (Supp. 2012). Pursuant to the plea agreement, Defendant received a four-year sentence for one count of identity theft, a four-year sentence for one count of prescription fraud, and two-year sentences for each of the remaining convictions. The parties agreed that the four-year sentences and one of the two-year sentences for prescription fraud would run consecutively to each other but concurrently to the sentences for the remaining

convictions for an effective sentence of ten years, with the manner of service to be determined by the trial court.

A transcript of the guilty plea hearing is not included in the appellate record. However, during the sentencing hearing, the State presented evidence of the circumstances that led to Defendant's convictions.

During the sentencing hearing, Alicia Joy McDaniels testified that Defendant was a nurse who cared for Ms. McDaniels's mother, Martha Hill, for a period of time. Ms. Hill had multiple sclerosis, was in a wheelchair, and was unable to care for herself. As a result, Ms. Hill's family hired a healthcare company, and Defendant was sent to care for Ms. Hill.

Ms. McDaniels testified that Ms. Hill was supposed to be taking one to two oxycodone pills every two hours and had a pain pump with a morphine drip. Ms. McDaniels explained that Ms. Hill's doctor wanted to slowly wean Ms. Hill off of the oxycodone so that she would rely solely on the pain pump. However, Ms. Hill was not able to be weaned off of the oxycodone due to her condition and continued to take the pills as prescribed. Ms. Hill was lethargic and required constant care. Ms. McDaniels said Ms. Hill's condition worsened as she continued to take the pills.

In October 2013, Ms. McDaniels began to care for Ms. Hill more often because Ms. Hill's health was such that she could not do anything for herself. Ms. McDaniels described the pills administered to Ms. Hill that Ms. McDaniels believed to be oxycodone as small white pills with obvious markings. One day, Ms. McDaniels noticed a small yellow pill in Ms. Hill's medicine bottle with the small white pills. Ms. McDaniels took the bottle of pills to the pharmacy in an effort to identify the yellow pill. The pharmacist was unable to identify the yellow pill and informed Ms. McDaniels that none of the white pills were oxycodone. Rather, he stated that the white pills were lorazepam, which is used to treat seizures and depression. Ms. McDaniels stated that Ms. Hill had been taking one to two of the white pills every two hours, and Ms. McDaniels learned that the normal dosage of lorazepam was one-half of a pill twice a day.

Ms. McDaniels testified that the pain clinic that maintained Ms. Hill's pain pump discovered that Ms. Hill's prescription for oxycodone continued to be frequently refilled. The personnel at the pain clinic turned off Ms. Hill's pain pump because they believed that Ms. Hill was either abusing or hoarding the medication. They also placed a "red flag" on Ms. Hill in their system so that she could not have any narcotics.

Ms. McDaniels stated that following the discovery of the pills, doctors discontinued all pain medication for Ms. Hill so that an investigation could be conducted.

Ms. McDaniels and other family members were suspects and were interviewed by police officers during the course of the investigation. Ms. Hill was without pain medication for approximately one month. Ms. McDaniels said that during this time, Ms. Hill was in constant pain. Ms. McDaniels took Ms. Hill to a hospital on multiple occasions, but because Ms. Hill was "red flagged," medical personnel could not provide her any medication for the pain and sent her home. After the investigation was completed, an officer informed Ms. McDaniels that Defendant admitted taking the medication from Ms. Hill.

Ms. McDaniels testified that Ms. Hill's condition has since improved. Ms. McDaniels stated that Ms. Hill experienced bad days during the entire time that Defendant was caring for her and that she now has some good days. Ms. Hill can walk a few feet and prepare her own food in a microwave. However, on occasion, Ms. Hill believes she sees people who are deceased. Ms. McDaniels stated that Ms. Hill did not have these symptoms before taking lorazepam, which can cause paranoia. Other than multiple sclerosis, Ms. Hill, who was sixty-two years old at the time of the sentencing hearing, did not have any other physical disabilities or illnesses. Ms. McDaniels stated that her father died from cancer during the same year.

In response to questioning about Defendant's possible sentence, Ms. McDaniels replied, "I don't know how to sentence her. I don't want to have to make that decision, but I don't want this to ever happen to anyone else again."

Detective Kevin Krieb with the Smyrna Police Department testified that when he investigated Defendant at the end of 2013 and the beginning of 2014, he was a member of a pharmaceutical diversion task force with the Drug Enforcement Administration. His investigation began when Comprehensive Pain Medication in Murfreesboro called a police officer about Ms. Hill, a hospice patient who was seeking a refill of her pain pump. Personnel at the facility reviewed Ms. Hill's prescription information through the State of Tennessee's prescription monitor program and discovered that approximately 6,000 oxycodone pills had been dispensed to Ms. Hill within the last ten months. The personnel at the pain clinic believed that either Ms. Hill or a member of her family was diverting the medication.

Detective Krieb described 6,000 pills as an "outrageously high" amount and said he had never seen an individual prescribed such a high number of pills in such a short period of time. He described opiates as a large problem in Tennessee and stated that they are "highly addictive and highly abused." Detective Krieb and another officer interviewed Ms. Hill and her family members and determined that the "missing part of the puzzle" was Defendant, Ms. Hill's hospice nurse.

- 3 -

Detective Krieb visited Caris Hospice in Murfreesboro, where Defendant was employed during the time period that she cared for Ms. Hill. Defendant was no longer employed by Caris Hospice at the time of Detective Krieb's visit. Detective Krieb later determined that fraudulent prescriptions for Lortab and Soma had been filled in the names of several hospice patients under Caris Hospice's care, and he began investigating the forging of prescriptions as a result. During the course of the investigation, Detective Krieb learned that Defendant had worked for a hospital in Tullahoma, Tennessee, where prescription medication was discovered missing and that personnel believed that Defendant was responsible for the missing medication.

On February 21, 2014, Detective Krieb learned that Defendant was at a pharmacy in Woodbury, Tennessee, attempting to obtain a fraudulent prescription in a hospice patient's name. He and two other officers went to the pharmacy and interviewed Defendant in the parking lot. Defendant gave a written statement, which was entered into evidence during the sentencing hearing.

In her statement, Defendant acknowledged that she took oxycodone from Ms. Hill and switched Ms. Hill's medication with folic acid on one or two occasions and with dexamethasone on one occasion. Defendant said that on other occasions, she "just took from the bottle." She acknowledged that on several occasions, she retrieved Ms. Hill's prescriptions from the pharmacy and never delivered them to her. Defendant could not recall the amount of medication that she took from Ms. Hill but estimated that it amounted to "1/2-3/4 of [the] total." Defendant also admitted taking prescription medication from other patients.

Defendant stated that she was fired from her job on January 22, 2014. She said she was blamed for taking medication from patients and that her employer believed that her job performance was unsatisfactory. She acknowledged that she wanted to "get back at them." As a result, she continued calling in prescription refills for Lortab and Soma for patients at multiple pharmacies and keeping them for herself. She denied selling the medication or giving it away.

Defendant stated that she had been an addict in the past and had recently relapsed. She maintained that she did not intend for anyone to get hurt and that she was sorry for hurting anyone, including her patients and coworkers.

Detective Krieb testified that at the time of the interview, Defendant was no longer employed with Caris Hospice, and he did not believe that Defendant was employed at any other medical facility. However, Defendant was in medical scrubs during the interview. Detective Krieb said Defendant told him either that her nursing license was in the process of being revoked or that she was going to surrender it. At the time of the

interview, Detective Krieb was unaware that the Board of Nursing had brought a disciplinary action against Defendant or that an order was entered on February 13, 2014, stating that Defendant had voluntarily surrendered her nursing license.

Detective Krieb spoke to Defendant over the telephone on a few occasions following the interview to verify information in her statement. Defendant admitted to Detective Krieb that she took pain medication, including oxycodone, Lortab, and Soma, from other hospice patients. Defendant estimated that she took sixty to seventy-five pills a few times from "one or two patients here and there." She also told the detective that she had taken medication from deceased patients rather than properly disposing of it.

Detective Krieb testified that Defendant told him that she began working for Caris Hospice in February 2013 and that she began diverting medication from patients in April 2013. Detective Krieb said Defendant was calling in fraudulent prescriptions of other hospice patients sometime prior to her termination and up to the time of the interview in the parking lot of the pharmacy. The prescriptions were shown to have been approved by Dr. Michael Herlevic, the doctor who oversaw Caris Hospice. However, Dr. Herlevic denied approving the prescriptions. Detective Krieb learned that Dr. Herlevic's prescriptions had been used in Rutherford County, Cannon County, and Coffee County.

Detective Krieb was unable to determine the total number of pills that Defendant fraudulently obtained. He estimated that the total included several thousand oxycodone pills and over 1,000 Lortab and Soma pills. He explained that Defendant was a primary caregiver nurse to several hospice patients who were prescribed a large amount of medication and that he could not interview those patients to determine what amount of medication was diverted. Defendant told Detective Krieb that she gave Ms. Hill 1,000 of the 6,000 oxycodone pills prescribed to her during that time period. Detective Krieb said that if Defendant was telling the truth, she diverted 4,500 to 5,000 of Ms. Hill's pills.

Detective Krieb presented testimony that the number of pills that Defendant obtained in an eight- to ten-month period was more than one person could consume on a daily basis without overdosing. He researched Defendant's prescription history through the prescription monitoring program and learned that Defendant was prescribed Lortab, a lesser-strength hydrocodone pill, on a few occasions during the last few years prior to her interview in February 2014. Detective Krieb stated that Defendant was able to communicate coherently with him during the interview. Detective Krieb called Defendant on two separate occasions after the interview and asked about her condition. He explained that based on his experience, opiate addicts who stop taking the pills experience withdrawal. Defendant told him that she was sleeping and feeling healthy, which surprised Detective Krieb. He offered her help to enroll in a rehabilitation program, and she declined. Detective Krieb testified that based on this information, he

concluded that "[e]ither [Defendant] has a shoe box in her house of 6,000 pills, or those pills were diverted to other people, either sold or given away to other people."

Detective Krieb testified that while interviewing Defendant, she consented to a search of her cellular phone. He stated that while he did not find any text messages indicating drug sales, he noticed that Defendant had an "app" that drug dealers use to communicate without leaving a paper trail or a text messaging field that can be intercepted.

Detective Krieb believed Defendant's actions amounted to a "horrible misuse of the medical profession." He stated that families rely on hospice nurses to ease the pain of loved ones so they can pass away peacefully. He believed that a hospice nurse "is held more accountable than any other nurse that comes into your home." He also believed that a message should be sent to nurses and other medical professionals that if they take medication from a patient who needs it, they will be severely punished.

On cross-examination, Detective Krieb testified that while Defendant was cooperative, he did not believe that she was entirely truthful. Detective Krieb acknowledged that Defendant provided some information that he would not have been able to discover on his own. He denied that he would not have discovered the names of the patients and pharmacies involved had Defendant not provided him with the information. He said he could have found the information by searching Dr. Herlevic's name in the prescription monitoring program and visiting the pharmacies listed in the program.

In response to questioning by the trial court, Detective Krieb testified that according to the latest statistics that he reviewed, Tennessee is ranked second in the listing of the states where opiate abuse occurs most often. He stated that Tennessee "has a huge opiate problem, which is turning into a heroin problem, which is also an opiate." He explained that Lortab, oxycodone, and other classification of opiates are gateway drugs to heroin. He said that the problem of prescription drug abuse has turned into a heroin problem and that he receives reports of overdoses "all the time." Detective Krieb stated that the issue affects the younger generation and will result in a health issue, explaining that many people from age sixteen to twenty-five are sharing needles to inject the drug, which can transmit hepatitis and HIV. He clarified that his investigation did not establish that Defendant was taking heroin.

During the hearing, the State entered as exhibits Defendant's presentence report and various documents from the Board of Nursing, including the agreed order whereby Defendant voluntarily surrendered her nursing license. The order stated that in 2011, while Defendant was employed as a home health nurse, two of her patients reported

discovering that their prescription medication was missing after Defendant left their homes. In 2012, while employed as a nurse in the intensive care unit of a hospital, Defendant was under investigation for narcotic diversion in that she dispensed narcotics three times more frequently than any other nurse. In October 2012, Defendant was asked to take a urine drug screen after a discrepancy in the number of pills was discovered, but she refused and then resigned. The order provided that Defendant admitted the allegations in the order.

Defendant made a statement at the sentencing hearing in which she maintained that Ms. Hill was hoarding pills and that Defendant switched Ms. Hill's medication in an attempt to wean Ms. Hill off of the medication and to fulfill Defendant's own "selfish needs." She said that she began caring for Ms. Hill in April 2013 and that Ms. Hill's family did not assist in caring for her until October 2013. Ms. Hill's health continued to decline during the time period in which Defendant was caring for her. Defendant stated that while she was out of town, another nurse found several hundred Lortab pills at Ms. Hill's home. Defendant did not know where Ms. Hill obtained the pills, and Defendant did not believe that Ms. Hill was prescribed Lortab during the first few months that Defendant was caring for her. Defendant stated that her cellular phone included text messages about Ms. Hill's medication but that Defendant erased all of her information pertaining to employment with Caris Hospice upon meeting Detective Krieb.

Defendant recalled that Ms. Hill's oxycodone prescription was delivered to Ms. Hill's home during the first few months while Defendant was caring for her. Defendant said she began "stepping in" and substituting Ms. Hill's oxycodone pills for folic acid, which was the yellow pill that was discovered in the pill bottle. Defendant acknowledged that substituting medication with a placebo was not a common practice for nurses and that she should not have done it. She said she last saw Ms. Hill toward the end of October 2013 when other nurses took over Ms. Hill's care "because of conflict." She also said that "one of the reasons I ordered medications to be taken more frequently was so I could just keep most of them for myself."

Defendant maintained that Ms. Hill would call the after-hours service or Defendant's cellular phone five to seven times each night with issues of paranoia. Defendant said, "That's why they fit me in there to begin with." Ms. Hill was living alone at the time, and Defendant believed that Ms. Hill's husband passed away a few weeks after Defendant began caring for Ms. Hill. Defendant stated that once Ms. Hill had surgery to insert the pain pump, her health declined significantly.

Defendant stated that she first became addicted to pain medication following a back injury when working at a hospital in 2004 or 2005. She said that her tolerance to

the medication was so high that she could take ten or more oxycodone pills five or six times a day.

Defendant stated that she told Detective Krieb that she had recently given up her nursing license voluntarily and that she knew she did not need to be a nurse. She maintained that she was "under the influence" when she wrote out her statement. She said that she offered to submit a urine or blood sample so the officers could determine the amount of medication in her system. She also said that during the interview, she was placed into a car with two men and was nervous and upset.

Defendant stated that when Detective Krieb called her following the interview, she did not feel "normal" even though she had been sleeping and that she had restless leg syndrome, which she said was an issue in cases of withdrawal.

Defense counsel informed the trial court that in August 2014, Defendant was placed on probation in Franklin County as a result of a similar conviction and had been on probation for almost two years at the time of the sentencing hearing. Defendant's probation officer, Joshua Rogers, was not available to testify at the sentencing hearing. However, the parties stipulated that Mr. Rogers would have testified that Defendant was placed on probation for three years and was required to complete an assessment and follow the recommendations. It was recommended that Defendant complete an intensive outpatient treatment program. Defendant was enrolled in the program in October 2014 and completed the program in June 2015. Defendant had complied with the terms of her probation and passed all random drug tests.

At the conclusion of the hearing, the trial court denied Defendant's request for alternative sentencing. In reaching its decision, the trial court considered the evidence presented during the plea hearing and the sentencing hearing, the circumstances of the offenses, the arguments of both parties, Defendant's statement, her potential for rehabilitation, statistical information provided by the Tennessee Administration Office of the Courts for similar offenses in Tennessee, the presentence report, Defendant's physical and mental condition, and her social history.

The trial court considered the applicable enhancement factors, finding that (1) the offenses involved more than one victim; (2) the victims were particularly vulnerable due to age or physical or mental disability; (3) Defendant had "no hesitation about committing a crime when the risk to human life was high"; and (4) Defendant "abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense." Tenn. Code Ann. § 40-35-114(3), (4), (10), (14). The trial court found that no mitigating factors applied.

The trial court noted that based on Defendant's history with her current probation, it appeared that she would abide by the terms of probation and that her risk of engaging in future criminal conduct was not great. The trial court found that although Defendant "might be rehabilitated with regard to her addiction," she had a history of prior criminal behavior based upon the allegations admitted by Defendant in the order from the Board of Nursing. The trial court stated that as a result, Defendant's criminal conduct spanned over several years. The trial court found that based on the "overwhelming" number of offenses to which Defendant pled guilty and her other criminal conduct, confinement was necessary to avoid depreciating the seriousness of the offenses. *See id.* § 40-35-103(1)(B). Noting that Tennessee ranked as one of the worst states for such offenses, the trial court found that confinement was necessary to provide an effective deterrence to others likely to commit similar offenses. *See id.* Accordingly, the trial court ordered Defendant to serve her ten-year sentence in confinement.

*Analysis*

Defendant contends that the trial court erred in ordering her to serve her sentence in confinement. The State responds that the trial court did not abuse its discretion in ordering Defendant to serve her sentence in confinement. We agree with the State.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id*. at 707. In *State v. Caudle*, our Supreme Court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the 2005 amendments to the Sentencing Act, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court must state on the record the factors it considered and the reasons for the ordered sentence. *Id*. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence ... should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6)(A). However, no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Instead, the defendant bears the burden of proving his or her suitability for alternative sentencing options. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)).

When imposing a sentence of full confinement, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

- 10 -

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In addition, the sentence imposed should be (1) "no greater than that deserved for the offense committed," and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id*. § 40-35-103(2), (4).

As a Range I, standard offender convicted of Class D felonies, Defendant was an appropriate candidate for alternative sentencing. *See id*. § 40-35-102(6). The trial court denied Defendant's request for an alternative sentence based upon Defendant's long history of criminal conduct. *See id.* § 40-35-103(1)(A). According to the agreed order before the Board of Nursing, Defendant was taking prescription medication from patients as early as February 2011, more than two years before the instant offenses occurred. Her behavior continued in 2012 while employed at a medical center. While Defendant argues that such conduct did not result in criminal convictions, the plain language of the statute applies to "criminal conduct" and is not limited to criminal convictions. *See id.* Moreover, according to the order, Defendant admitted to the allegations. Accordingly, the trial court did not abuse its discretion in denying Defendant's request for an alternative sentence based on Tennessee Code Annotated section 40-35-103(1)(A).

The trial court also denied Defendant's request for an alternative sentence based upon the need to avoid depreciating the seriousness of the offense and the need for deterrence. *See id.* § 40-35-103(1)(B). The record establishes that Defendant, a nurse, took prescription pain medication from hospice patients who were entrusted in her care. She substituted Ms. Hill's pain medication with lorazepam, which is used to treat seizures and depression. As a result, Ms. Hill was taking up to twice the normal daily dosage of lorazepam every two hours. Ms. Hill was deprived of pain medication for one month and was in extreme pain during that month. Defendant also used a doctor's identification to obtain false prescriptions under the names of her patients. Even after Defendant was fired from Caris Hospice, she continued to obtain false prescriptions under the patients' names. In her written statement, Defendant acknowledged she was blamed for taking medication from patients, that her employer believed that her job performance was unsatisfactory, and that she said that she wanted to "get back at them." Detective Krieb was unable to determine the exact amount of medication that Defendant obtained but estimated that the number of pills was in the thousands. Detective Krieb expressed

- 11 -

doubts as to a person's ability to take such a number of pills in an eight to ten-month period without overdosing and concluded that "[e]ither [Defendant] has a shoe box in her house of 6,000 pills, or those pills were diverted to other people, either sold or given away to other people."

Detective Krieb, a two-year member of the DEA pharmaceutical task force, described opiates as a large problem in Tennessee and stated that they are "highly addictive and highly abused." He testified that according to the latest statistics that he reviewed, Tennessee is ranked second in the listing of the states where opiate abuse occurs most often. Accordingly, the record supports the trial court's findings.

Defendant contends that the trial court erred in finding that confinement was necessary to avoid depreciating the seriousness of the offenses because the circumstances of the offenses were not "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree" and the nature of the offenses did not outweigh all factors favoring a sentence other than confinement. *See State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006). Defendant also contends that the trial court erred in denying an alternative sentence based on the need for deterrence because the trial court failed to consider the factors listed in *State v. Hooper*. *See State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000) ("[W]e hold that a trial judge may sentence a defendant to a term of incarceration based solely on a need for deterrence when the record contains evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes."). However, because the trial court's decision was not based solely on the need to avoid depreciating the seriousness of the offenses or solely on the need for deterrence, "the heightened standard of review that applies to cases in which the trial court denies probation based on only one of these factors is inapplicable in this case." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (citing *Trotter*, 201 S.W.3d at 654; *Hooper*, 29 S.W.3d at 13). Accordingly, the trial court did not abuse its discretion in ordering Defendant to serve her sentence in confinement.

*Conclusion*

For the foregoing reasons, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

- 12 -